**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Indianapolis Division**

| | |
|---|---|
| REGINA SHELTON, )<br>    *Plaintiff*, )<br> )<br>v. )<br> )<br>EQUIFAX INFORMATION SERVICES, LLC, )<br>and NISSAN MOTOR ACCEPTANCE CORP., )<br>    *Defendants*. ) | **Case No.**   1:19-cv-2726 |

## COMPLAINT WITH JURY TRIAL DEMAND

Plaintiff, Regina Shelton ("Shelton"), by counsel, complains of Defendants, Equifax Information Services, LLC. ("Equifax"), and Nissan Motor Acceptance Corporation ("Nissan"), as follows:

### Preliminary Statement

1. Under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.A. § 1681 (West) *et seq.*, consumer reporting agencies are charged with three primary duties: (1) the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports, 15 U.S.C. § 1681e (b); (2) the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information, 15 U.S.C. § 1681i; and, (3) the duty to note a disputed item in the consumer's credit report, 15 U.S.C. § 1681c(f).

2. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate or misleading information explicitly includes the duty to notify the providers of the disputed information. This is because the provider of the disputed information stands in a far better position to make a thorough investigation of the disputed information than the credit reporting

agency.

3. The FCRA also imposes duties on said providers of credit information ("Furnishers") to credit reporting agencies. Specifically, the statute requires Furnishers to "conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b)

4. Then, "[i]f an item of information disputed by a consumer is found to be inaccurate, incomplete or cannot be verified," the Furnisher must "promptly" "modify" "delete," or "permanently block the reporting of that piece of information." 15 U.S.C. § 1681s-2(b)

5. In determining whether a furnisher violated § 1681s-2(b), courts first ask whether the Furnisher "conduct[ed] a reasonable investigation of their records to determine whether the disputed information can be verified."

6. Generally, questions regarding the reasonableness of an investigation are best for a jury to determine. *See Meyer v. F.I.A. Card Serv*., N.A., 780 F. Supp. 2d 879, 883 (D. Minn. 2011). That said, regardless of an investigation's reasonableness, a Furnisher may be entitled to summary judgment if the consumer fails "to show actual inaccuracies that a furnisher's objectively reasonable investigation would have been able to discover."

7. The Seventh Circuit and multiple other circuit courts have held that, "even if [credit] information is technically correct, it may nonetheless be inaccurate if, through omission, it "creates a materially misleading impression." *Johnson v. Equifax, LLC.,* 524 F. App'x 268, 370 (7th Cir. 2013) ("Johnson must prove that something in his credit report was inaccurate, or at least misleading, to show that the defendants' procedures were unreasonable"); *Seamans v. Temple Univ*., 744 F.3d 853, 865 (3d Cir. 2014); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008); *Llewellyn v. Allstate Home Loans,Inc.*, 711 F.3d 1173, 1186 (10th Cir. 2013); *Gorman v. Wolpoff & Abramson, LLP*, 584 F. 3d 1147, 1157 (9th Cir. 2009); *Boggio v. USAA Fed.*

*Sav. Bank*, 696 F.3d 611, 616 (6th Cir. 2012).

8. Furnishers also have a freestanding duty under 15 U.S.C. § 1681s-2(a)(3) to inform credit reporting agencies that credit information is disputed. As noted above, consumers may not enforce provisions of sub-section (a) directly. However, " the fact that a furnisher is affirmatively obligated to flag an account as disputed under § 1681s-2(a) does not undermine the conclusion that a *failure* to flag the account as disputed also constitutes a material inaccuracy under § 1681s-2(b)." *Seamans*, 744 F. 3d at 867.

9. Thus, several Circuits have also built upon the materially misleading standard by specifically holding that a Furnisher may "create a materially misleading impression" when, "having received notice of a consumer's potentially meritorious dispute, [the] furnisher subsequently fails to report that claim is disputed. *Gorman*, 584 F.3d at 1162-64; *Saunders*, 526 F.3d at 149-50. This is so because "fail[ing] to report a bona fide dispute" "could materially alter how the reported debt is understood."

10. This action is based on Defendants' false reporting on Plaintiff's credit reports, failure to report that a claim is disputed, and failures to follow reasonable procedures and to conduct reasonable reinvestigations with respect to such information.

### Jurisdiction and Venue

11. Because this case arises under the FCRA, this Court has federal question jurisdiction pursuant to 28 U.S.C.A. § 1331 (West).

12. This Court has personal jurisdiction over the Defendants because they routinely conduct business in the State of Indiana, including the conduct complained of herein.

13. Venue is proper in the Southern District of Indiana because a substantial part of the events or omissions giving rise to the claims herein occurred in this district as required by 28 U.S.C.A. § 1391 (West).

**Parties**

14. Shelton is a natural person who resides in Indianapolis, Indiana.

15. Shelton is an individual and is therefore a "consumer" as that term is defined by 15 U.S.C.A. § 1681a(c) (West).

16. Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties, and uses interstate commerce to prepare and/or furnish the reports, and accordingly, is considered a "consumer reporting agency" as that term is defined by 15 U.S.C.A. § 1681a(f).

17. Nissan regularly and in the ordinary course of business furnished information to one or more consumer reporting agencies about Shelton's transactions and is therefore a "furnisher" as that term is used in 15 U.S.C.A. § 1681s-2 (West).

**Factual Allegations Regarding Shelton's Bankruptcy Proceedings.**

18. On or about October 7, 2016, Shelton filed a Chapter 7 bankruptcy proceeding in the Southern District of Indiana, under Cause No. 16-07772-JJG-7.

19. Nissan was listed on Shelton's Schedule D, showing a claim in the amount of $7,248.00.

20. A true and accurate copy of Shelton's Schedule D is attached hereto as "Exhibit A."

21. On December 7, 2016, a Reaffirmation Agreement was entered by and between Shelton and Nissan.

22. A true and accurate copy of the Reaffirmation Agreement is attached hereto as

"Exhibit B."

23. Shelton continued to make payments towards her obligation to Nissan during and after her bankruptcy proceedings.

24. Shelton's obligation to Nissan was not discharged via her Chapter 7 bankruptcy filing.

25. Since the completion of her Chapter 7 bankruptcy proceedings, Shelton has paid off her obligation to Nissan.

### Factual Allegations Regarding The CDIA, Metro 2, And Credit Risk Scoring.

26. The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment.

27. In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Consumers can help raise their credit score by having errors on their credit reports corrected, and consumers seeking to rebuild their credit would be well advised to obtain their credit reports and review them for accuracy.

28. The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

29. Because consumer credit reporting information has such far reaching implications for nearly all consumers, the CDIA works together with CRAs to develop, maintain, and enhance industry standard reporting formats and guidelines.

30. The product of that cooperation is the Metro 2 reporting standards published by the CDIA to assist Furnishers with their compliance requirements under the FCRA. *See* http://www.cdiaonline.org/about/about-cdia/

31. The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and data furnishers ensure that they are in compliance with their obligation to maintain complete and accurate information under the FCRA.

32. The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

33. Equifax, Trans Union and Experian also developed a browser based software system that allows them to electronically notify Furnishers quickly and easily about disputed credit reporting information, and for Furnishers to quickly and easily respond to such disputes following investigation. The system is commonly referred to as e-OSCAR and was designed to be Metro 2 compliant. See, *https://www.e-oscar.org/implementation/about-us*

34. The e-Oscar system primarily supports Automated Credit Dispute Verificaiton ("ACDV") and Automated Universal Dataform ("AUD") processing but also various related data reporting processes.

35. ACDVs are notifications initiated by a CRA, and transmitted to a Furnisher, in response to a consumer dispute, and are the primary method the CRAs use to fulfill their statutory obligation to notify Furnishers of disputed information of consumers' disputes.

36. Equifax, Trans Union and Experian have actual knowledge that entities reviewing

consumer reports prepared by them reasonably presume they have complied with CDIA guidelines and Metro 2 standards in compiling and reporting the data therein.

37. One such entity that regularly reviews consumer reports, and uses the data contained therein is the Fair Isaac Corporation.

38. The Fair Isaac Corporation uses the data in consumer reports to calculate a consumer's credit score (also known as credit risk scores).

39. The term credit score is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, Supervision and Examination Manual, Version 2 (October 2012), p 53, available at *http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf*

40. The Fair Isaac Corporation credit risk scoring system ("FICO") is the leading credit risk scoring system, and utilizes data reported by credit reporting agencies and furnishers which are, ostensibly, in compliance with Metro 2 standards.

41. FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and, mix of accounts/types of credit accounts for 10% of a consumer's FICO score.

*See www.myfico.com/credit-education/whats-in-your-credit-score/.*

42. The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate,

extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's FICO score.

43. Inaccurate or incorrect credit reporting often results in a lower FICO score, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

44. The improper deletion or suppression of a mortgage or automobile tradeline can have a particularly adverse effect on a consumer's FICO score as it removes any positive payment history of the largest credit line maintained by them (35% of a consumer's FICO score), it alters the age/length of credit history (15% of a consumer's FICO score), and it alters the mix of accounts/types (10% of a consumer's credit score).

### Inaccurate and Materially Misleading Information Reported by Equifax.

45. Sometime in March of 2017, Shelton obtained a copy of her consumer credit report as published by Equifax.

46. The report contained erroneous information as provided by Nissan, now published and reported by Equifax. Specifically, the Equifax credit report failed to reflect the obligation was reaffirmed, that Shelton continued to make timely and or that adequate payments during and after the bankruptcy proceedings referenced above.

47. Because the foregoing obligation had in fact been reaffirmed not discharged, the information described above was inaccurate and misleading.

48. Equifax's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, as discussed above.

49. While not dispositive, Courts rely on such guidance to determine furnisher liability. *See Nissou-Rabban v. Capital One Bank (USA), N.A.*, 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018).

50. Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See Gillespie v. Equifax Info. Servs., LLC*., No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

51. In a letter dated July 31, 2017, Shelton disputed the inaccurate and misleading information to Equifax and advised Equifax of the specific facts that rendered the reporting inaccurate and misleading.

52. A true and accurate copy of the dispute letter is attached hereto as "Exhibit C."

53. Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Nissan of Plaintiff's dispute within five (5) business days of receiving Plaintiff's dispute, to forward all relevant information and any documents included with Plaintiff's dispute for Nissan to review, to conduct a reasonable reinvestigation of the disputed information, and to thereafter correct the tradeline or delete it from Plaintiff's consumer file.

54. Upon information and belief, Equifax timely notified Nissan of Shelton's dispute in accordance with 15 U.S.C.A. § 1681i (West).

55. In the alternative, Equifax failed to provide Nissan with notice of Shelton's dispute.

56. In response, within a document dated August 27, 2017, Equifax advised Shelton that it had researched her dispute and the current status was being reported correctly.  However, Equifax provided a copy of the tradeline as reported that reproduced some of the errors identified by Shelton in her original dispute letter.  Specifically, the tradeline still failed to indicate that Shelton continued to make timely and adequate payments on the obligation, instead reflecting a "Date of Last Activity" of "09/2016" and an "Actual Payment Amount" of $0.

57. A true copy of the Equifax reinvestigation report is attached as "Exhibit D."

58. Shelton provided all necessary information with her dispute letter to Equifax, does have a current Equifax file, and has actively used credit in the past ten years.

59. Equifax was required to communicate the specifics of Shelton's dispute to Nissan. Likewise, Nissan had a duty to investigate the dispute and accurately report their findings to Equifax.

60. Equifax had an affirmative duty to reasonably reinvestigate the dispute submitted by Shelton and to accurately report the tradeline information notwithstanding the information it received Nissan.

61. In June of 2019, having paid off her obligation to Nissan, Shelton again obtained a copy of her Equifax credit report.

62. A true and accurate copy of the Equifax credit report dated June 7, 2019, is attached hereto as "Exhibit E."

63. The Equifax credit report dated June 7, 2019, contains additional erroneous information as provided by Nissan, now published and reported by Equifax. Specifically, the Equifax credit report still reflects a "Balance Amount" of "$2,534.00", the same amount it did on the reinvestigation report described above, a "Scheduled Payment Amount" of $316, and a "Status" of "Pays As Agreed."

64. Because Shelton's obligation to Nissan was paid in full and closed, the information detailed above was and remains inaccurate and misleading.

### Equifax's Willful Conduct in Detail.

65. Under § 1681i, which mandates the procedures a CRA must follow in cases of disputed accuracy, there are (only) two scenarios under which a CRA *may* legally be allowed to refrain from notifying the furnisher of disputed information of a consumer's dispute: 1.) if a CRA

determines that a consumer's dispute is frivolous or irrelevant; and/or, 2.) if the CRA resolves the dispute under an expedited dispute resolution process.

66. Neither scenario applies to Equifax's conduct complained of herein.

67. Under § 1681i(a)(3), a CRA *may* be relieved of its duty to notify the furnisher of the disputed information of the consumer's dispute if the CRA determines that a consumer's dispute is frivolous or irrelevant.

68. However, because § 1681i(a)(2) requires that a CRA notify a furnisher of disputed information within five (5) days of receiving a consumer's dispute, the CRA must make the determination that the dispute is frivolous or irrelevant before the five (5) days is up.

69. In the event, a CRA determines that a consumer's dispute is frivolous or irrelevant, § 1681i(a)(3) requires the CRA to notify the consumer notice of the CRA's determination. That notice must: be given within five (5) days of the CRA's determination; be in writing, or by other means authorized by consumer; state the reason(s) the CRA determined the dispute was frivolous or irrelevant; and, identify any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

70. Equifax did not inform Plaintiff that it had determined her dispute was frivolous or irrelevant, as required by § 1681i(a)(3)(B) if a dispute is determined to be frivolous or irrelevant.

71. Equifax did not identify any information required to investigate Plaintiff's dispute, as required by § 1681i(a)(3)(C) if a dispute is determined to be frivolous or irrelevant.

72. Rather, in the reinvestigation report dated August 27, 2017, Equifax stated, "Our investigation of the dispute you recently submitted is now complete."

73. Plaintiff's dispute was clear and unambiguous as to the inaccurate information that Equifax was reporting.

74. Equifax had clear notice that the information it was reporting was false and misleading.

75. Plaintiff provided Equifax with all of the necessary information for Equifax and Nissan to investigate Plaintiff's dispute, and to correct the false and misleading information.

76. If Equifax had conducted a reasonable reinvestigation and notified Nissan of Plaintiff's dispute, the Nissan information would be reported accurately.

77. Equifax knew that it had a duty to conduct a reasonable reinvestigation of Plaintiff's dispute.

78. Equifax had the ability to easily conduct a reasonable reinvestigation of Plaintiff's dispute.

79. Despite the foregoing, Equifax made the intentional choice to not conduct a reasonable reinvestigation of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

80. Accordingly, Equifax's conduct was willful.

81. Equifax knew that it had a duty to notify Nissan of Plaintiff's dispute within five (5) business days of receiving Plaintiff's dispute.

82. Equifax had the ability to easily notify Nissan of Plaintiff's dispute, via e-Oscar or otherwise.

83. Despite the foregoing, Equifax made the intentional choice to not notify Nissan of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

84. Accordingly, Equifax's conduct was willful.

### Injury to Plaintiff As A Result of the Acts and Omissions Herein

85. The Defendants acts and omissions have injured Shelton in several ways including but not limited to the diminishment of her FICO and other credit scoring models.

86. The Defendants impermissibly failed to correct Shelton's tradeline, which relates to a large secured debt obligation, without conducting a reasonable reinvestigation of the disputed information, without notifying Shelton, and without just cause.

87. The failure to correct a large secured debt obligation, negatively affected and diminished her FICO and other credit scoring model scores by excluding positive payment history, length of credit history, and credit mix information that would, but for the suppression or deletion, be used to calculate her credit score.

88. The current reporting of a balance due and a scheduled payment amount on a debt that has been paid off is also negatively affecting her credit scoring model scores.

89. Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc.*, 868 F.3d 1275 (11th Cir. 2017)("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Nissan Loan Servicing, LLC.*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Nissan greater payments and a higher interest rate."); *Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691 (N.D. Ill. 2016)("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing.") *Binns v. Nissan Loan Servicing, LLC.*, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms").

90. Shelton was and remains desirous of improving her FICO and other credit risk modeling scores so obtain financing and insurance at more favorable rates.

91. Shelton is currently paying increased interest and insurance premiums that are not reflective of her true credit risk.

92. As such, Shelton took specific actions to address inaccuracies and misleading information in her credit reports.

93. If the Defendants had upheld their duties to report accurately and conducted a reasonable investigation of Shelton's dispute, the tradeline would have been reporting as a current and positive account in late 2017 and paid off as of the most recent report.

94. If the secured debt obligation was reported as a positive account with a history of timely and adequate payments, Shelton's FICO and other credit scoring model scores would be improved.

95. If Shelton's FICO and other credit model scores were improved to where they should be, she could avail herself to additional credit opportunities or credit opportunities at more favorable rates, and enjoy the cost savings inherent thereto.

## TRIAL BY JURY

96. Shelton is entitled to and hereby requests a trial by jury.

## CAUSES OF ACTION

### COUNTS I & II: VIOLATION OF THE FCRA (EQUIFAX)
[15 U.S.C.A. § 1681e(b) and 1681i (West)]

97. Shelton incorporates by reference all preceding paragraphs as though fully stated herein.

98. Equifax negligently, or in the alternative willfully, violated 15 U.S.C.A. §1681e(b)

by failing to follow reasonable procedures to assure the maximum possible accuracy of Shelton's consumer reports in failing to report the Nissan obligation as paid, disputed, and/or with all relevant information.

99. Equifax also negligently, or in the alternative willfully, violated 15 U.S.C.A. § 1681i in multiple ways including without limitation by failing to conduct a reasonable reinvestigation of Shelton's dispute and by failing to appropriately modify inaccurate information in Shelton's file. *See Zahran v. Bank of Am.*, 2015 WL 4397779 (N.D. Ill. July 17, 2015)

100. As a result of Equifax's violation of 15 U.S.C.A. § 1681e(b) and 15 U.S.C.A. §1681i, Shelton has suffered actual damage including but not limited to emotional distress, the unjust suppression of her FICO credit score, the resulting payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, and a material risk of future financial harm. Therefore, Shelton is entitled to recover actual and statutory damages pursuant to 15 U.S.C.A. § 1681n and 1681o (West).

101. Shelton is entitled to recover costs and attorney's fees from Equifax pursuant to 15 U.S.C.A. § 1681n and 1681o.

### COUNT III: VIOLATIONS OF THE FCRA
[15 U.S.C.A. § 1681s-2(b)]

102. Shelton incorporates by reference all preceding paragraphs as though fully stated herein.

103. Nissan willfully and/or negligently violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Shelton's dispute from one or more consumer reporting agencies, and/or by failing to review all relevant information provided by the consumer reporting agencies, and/or by failing to appropriately report the results of its

investigations, and/or by failing to appropriately modify, delete, and/or block the inaccurate information.

104. As a result of Nissan's violations of 15 U.S.C.A. § 1681s-2(b), Shelton has suffered actual damages including but not limited to emotional distress (including aggravation, anxiety, and loss of rest), the unjust suppression of her FICO credit score, the payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, and a material risk of future financial harm. Therefore, Shelton is entitled to recover actual damages under 15 U.S.C.A. § 1681n and 1681o.

105. Nissan's actions and omissions were willful, caused Shelton concrete injury as set for above, rendering it liable for punitive damages and/or statutory damages pursuant to 15 U.S.C.A. § 1681n.

106. Shelton is entitled to recover costs and attorney's fees from Nissan pursuant to 15 U.S.C.A. § 1681n and 1681o.

**WHEREFORE**, Shelton respectfully requests the following relief:

a. Actual damages;

b. Statutory damages;

c. Punitive damages pursuant to 15 U.S.C.A. § 1681n;

d. Reasonable attorney's fees and costs pursuant to 15 U.S.C.A. § 1681n and/or 1681o;

e. That an Order be issued for the Defendants to modify the inaccurate information being reported; and

f. Such other and further relief deemed just and proper.

Respectfully submitted,

*/s/ Frank D. Otte*
Frank D. Otte, No. 19859-49

**CLARK QUINN MOSES SCOTT & GRAHN LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
fotte@clarkquinnlaw.com
*Counsel for the Plaintiff*